[No. 29005-1-III.   Division Three.   November 22, 2011.]

CARLOS DIAZ ET AL., *Respondents*, v. WASHINGTON STATE MIGRANT COUNCIL, *Petitioner*.

60

62

*Karen P. Kruse* and *Catherine M. Morisset* (of *Jackson Lewis LLP*), for petitioner.

*George Fearing,* for respondents.

¶1 SIDDOWAY, J. — This interlocutory appeal calls upon us to address a corporation's responsibility for responding to discovery when members of its board of directors refuse to provide relevant information because of concern for their individual exposure to criminal prosecution. The trial court correctly recognized that while the board members had the right, individually, to invoke their privilege against self-incrimination when deposed, a corporation enjoys no Fifth Amendment privilege.

¶2 Following oral argument and preparation of this opinion, the parties notified us that they had settled their disputes and requested dismissal of the appeal. Notwith-

standing that the case is moot, we choose to review the discovery issues, which are likely to recur.[1]

█ ¶3 We hold that when a party makes a proper discovery request for information relevant to its claims and a corporation fails to respond because corporate principals refuse to provide needed information, a court may order a response from the corporation and, if the corporate principals persist in withholding information, may impose the adverse consequence of the frustrated discovery on the corporation. An adverse inference is an appropriate remedy for the failure to permit discovery.

## FACTS AND PROCEDURAL BACKGROUND

¶4 The Washington State Migrant Council (Migrant Council) is a nonprofit Washington corporation that provides educational services to children of low income, migrant, and seasonal farm workers in rural communities across the state. It receives much of its funding through grants from the federal government, particularly the federal Head Start program. At times relevant to this case it operated with an annual budget of $33 million. Its operations are overseen by a nine-member board of directors,

---

[1] As a general rule, Washington appellate courts will not review a moot case. *Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 796, 225 P.3d 213 (2009) (quoting *In re Marriage of Horner*, 151 Wn.2d 884, 891, 93 P.3d 124 (2004)). However, we may review a moot case if it presents issues of continuing and substantial public interest. *Id.* In deciding whether a case presents issues of continuing and substantial public interest,

> "[t]hree factors in particular are determinative: '(1) whether the issue is of a public or private nature; (2) whether an authoritative determination is desirable to provide future guidance to public officers; and (3) whether the issue is likely to recur'. A fourth factor may also play a role: the 'level of genuine adverseness and the quality of advocacy of the issues'. Lastly, the court may consider 'the likelihood that the issue will escape review because the facts of the controversy are short-lived'."

*Id.* at 796 (alteration in original) (quoting *Horner*, 151 Wn.2d at 892 (quoting *Westerman v. Cary*, 125 Wn.2d 277, 286-87, 892 P.2d 1067 (1994))). In addition to being likely to recur, the discovery issues presented by this case are seldom raised at the appellate level, as a result of which there is little authoritative guidance. For these reasons, we find that this case, while moot, presents an issue of continuing and substantial public interest warranting review.

which, consistent with federal requirements, includes parents whose children have participated in its Head Start programs. 42 U.S.C. § 9837(c)(1)(B)(iv).

¶5 In September 2007, the *Yakima Herald-Republic* reported that a Migrant Council board member and chair had a Social Security number identical to that of a woman living in Spokane. The story questioned whether the board chair was legally in the United States. Carlos Diaz, who was employed by the Migrant Council as its executive director from 1983 until December 2007, claims that the board chair thereafter admitted to Mr. Diaz that he was an illegal immigrant. Mr. Diaz learned at about the same time that the Internal Revenue Service had notified Migrant Council personnel that Social Security numbers provided by some of the board's other members and used by the Migrant Council on Form 1099 (reporting stipends and expense reimbursements) did not match federal records. Mr. Diaz claims that after consulting an attorney he concluded that the illegal immigration status of a board member could compromise the Migrant Council's future funding and pressed board members to provide proof of their legal status or, if not legally in the United States, that they resign.

¶6 The board discharged Mr. Diaz in December 2007. He filed this action challenging his discharge as invalid, given what he claims was the illegal constitution of the board; alternatively, he seeks damages for a discharge that he contends violated public policy. The Migrant Council claims that its board discharged Mr. Diaz for misconduct and poor performance.

¶7 Mr. Diaz served discovery on the Migrant Council seeking, among other information, the citizenship and immigration status of its board members. The Migrant Council objected to the discovery, principally on the bases that the discovery was not reasonably calculated to lead to the discovery of relevant evidence and that it should be foreclosed on grounds of prejudice to the board members.

¶8 At issue are the following interrogatory and request for production:

**INTERROGATORY NO. 20**: For each member of the board of directors, indicate: (1) the nation of his or her citizenship; and (2) whether the member was legally within the United States at the time of Carlos Diaz' termination from employment.

**REQUEST FOR PRODUCTION NO. 8**: [Produce] [d]ocuments of citizenship for each member of the Board of Directors at the time of the termination of Carlos Diaz' employment.

Clerk's Papers (CP) at 1611, 1616. Mr. Diaz moved to compel responses. He conceded in moving to compel that the board members were free, individually, to assert their right against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution. CP at 1595. The Migrant Council filed a cross motion for a protective order limiting discovery into citizenship and immigration status. It also sought confidential treatment for any such matters addressed in upcoming depositions of members of its board.

¶9 The trial court ordered that the discovery be answered. Although questioning any basis for Mr. Diaz's claim that illegal immigrants could not serve on the board of a Washington nonprofit corporation, it found that the information requested was relevant at a minimum to Mr. Diaz's claim that he was discharged in retaliation for insisting that board members illegally in the United States resign. The trial court also ruled that questioning on immigration status would be permitted at depositions of board members. It agreed to enter a protective order covering the immigration status information "on a tentative basis with the understanding that I will probably at some point lift it," adding that if, "as [the] legal aspect of this case develops, if it's probative of the plaintiff's case, it's going to come out." Report of Proceedings (RP) (Sept. 8, 2009) at 40.

¶10 Depositions of most board members were taken shortly thereafter. Several, represented by their own law-

yers, invoked the Fifth Amendment in response to questions about their citizenship and residency. In a supplemental response to interrogatory 20 following the order compelling discovery, the Migrant Council provided an answer as to one board member but identified other directors who declined to provide personal information concerning their citizenship or legal residency status. It incorporated by reference all deposition testimony of board members addressing these issues, including their invocation of the Fifth Amendment. It supplemented its response to request for production 8, stating that because board members were not employees it had never completed I-9 verification forms[2] for them and had no other responsive documents among its business records. It stated that board members had been asked, but declined, to provide the Migrant Council with personal "documents of citizenship." CP at 1371-73.

¶11 Still not having received the requested information and documents, Mr. Diaz moved for an order of contempt. The remedy he requested was that the court strike the defendant's answer and grant judgment in his favor. At the hearing on this second motion, the trial court announced it likely would grant a default judgment in light of Mr. Diaz's inability to obtain answers to "critical questions in this case." RP (Oct. 30, 2009) at 28-29. The court recognized the right of the board members to invoke the Fifth Amendment but viewed it as having consequences for the Migrant Council. As explained by the court:

[LAWYER FOR MIGRANT COUNCIL:] . . . The board members who have taken the 5th have a personal right to take the 5th concerning their immigration status.

THE COURT: Well, they have that right, but it's not without consequences.

---

[2] Form I-9 is an employment eligibility verification form required to document that each new employee (citizen and noncitizen) is authorized to work in the United States. *See* 8 C.F.R. § 274a.2(a)(2).

[LAWYER FOR MIGRANT COUNCIL]: They are not parties as to their personal matters, though.

THE COURT: Right.

[LAWYER FOR MIGRANT COUNCIL]: So the Court has no power over them as to—

THE COURT: The question is it either has consequences for Mr. Diaz or consequences for the Washington Migrant Council. I don't think it has consequence for them, because they have a right to take it.

[LAWYER FOR MIGRANT COUNCIL]: Well, and how can it have consequences for the Migrant Council when we are precluded by the ethical rules of the legal profession to talking to these people who took the 5th in deposition about that matter, which is something they received personal immigration [counsel] about?

THE COURT: Well, because they're board members. That's why you have consequences.

*Id.* at 25. In response to the Migrant Council's lawyer's further protest that she tried to obtain information but was conflicted from providing board members with personal legal advice, the trial court reiterated that the problem was not with the Migrant Council's request, the other members of the board, or with the lawyers; rather, "The problem is that you lose a lawsuit if your board members take the 5th. That's what happens. How else can we litigate this issue?" *Id.* at 26. Ultimately, the trial court granted the Migrant Council's request for an additional several weeks to convey the prospect of a default to board members, to see if they would reconsider providing information.

¶12 At a third hearing scheduled for the Migrant Council to report back, its lawyers informed the court of board members who had now disclosed that they were not citizens of the United States but invoked the Fifth Amendment rather than respond to questions whether they were lawfully in the country. They identified other board members who continued to invoke the Fifth Amendment in response to questions as to both their citizenship and their lawful

presence in the United States. The Migrant Council responded to the remaining outstanding discovery. With several board members refusing in whole or in part to respond, the trial court entered the order of default on liability requested by Mr. Diaz.

¶13 On November 30, 2009, six months after interposing its objections and four months after Mr. Diaz filed his motion to compel, the Migrant Council moved for reconsideration, arguing for the first time that if a discovery sanction were appropriate, "a lesser sanction is available and is more suitable for addressing the issue of concern to the Court: i.e., an adverse inference instruction about the immigration status of the former or current Board members who invoked their Fifth Amendment rights." CP at 1082-83. At the fourth hearing dealing with the discovery, the court granted the requested reconsideration, set aside the default, and agreed to impose the lesser sanction of an adverse inference instruction. At a presentment hearing thereafter, the parties debated the content of the instruction. The court's order was largely in the form proposed by the Migrant Council, providing that the jury would be instructed that it could infer that board members invoking their Fifth Amendment privilege were not lawfully in the United States. It made one modification, interlineating, at Mr. Diaz's request, that "the jury may, but is not require[d] to, infer that Mr. Diaz was discharged by the board for raising the issue of their immigration status." CP at 252. In entering the order, the trial court emphasized its tentative nature:

> THE COURT: . . . [T]he trial judge is going to be free to do whatever they want on that. You know, they can after hearing the testimony, they may have—they may be unwilling to instruct the jury to that in that regard. I can't control that. This has got to be taken as a motion in limine in an effort to shape this case in advance of trial, which are always tentative, and they're always subject to change.

RP (Apr. 6, 2010) at 16. The court awarded Mr. Diaz $1,500 in attorney fees over the Migrant Council's objection that he had not made a timely fee request and it had not had an opportunity to respond.

¶14 After the default judgment was vacated, the Migrant Council moved for summary judgment on several grounds. The trial court granted Mr. Diaz's request to strike the motion insofar as it relied on the Migrant Council's claimed overriding justification for his discharge,[3] in light of the Migrant Council's failure to respond to his immigration status discovery. When the Migrant Council complained that this was an unwarranted further sanction, the court explained:

> I did not limit the scope of summary judgment as a discovery sanction. That wasn't the rationale at all. My concern was, is you have a defendant who refuses to answer questions on the key factual issues in the case, and then that same defendant files a motion for summary judgment, and I wanted to make very certain that none of the summary judgment issues touched or even got near the facts that the defendant has refused to answer questions regarding.

RP (Apr. 19, 2010) at 13.

¶15 The Migrant Council sought interlocutory review, asking this court to determine that the trial court's order finding contempt and imposing sanctions was appealable as a matter of right under RCW 7.21.070.[4] It sought discretionary review under RAP 2.3 of the form of the adverse inference instruction and the orders imposing

---

[3] To prove his claim for wrongful termination in violation of public policy, Mr. Diaz is required to prove among other elements, that the Migrant Council is not able to offer an overriding justification for his dismissal (the absence of justification element). *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996).

[4] RCW 7.21.070 provides that a party may appeal an adjudication of contempt if it is a final order or judgment because willful resistance has been established and the sanction is a coercive one designed to compel compliance with the court's order. *Seattle Nw. Sec. Corp. v. SDG Holding Co.*, 61 Wn. App. 725, 733, 812 P.2d 488 (1991) (citing *Arnold v. Nat'l Union of Marine Cooks & Stewards Ass'n*, 41 Wn.2d 22, 246 P.2d 1107 (1952)).

attorney fees and limiting the arguments it could raise by summary judgment motion. Our commissioner found that the order finding contempt and imposing sanctions was appealable as a matter of right and, in the alternative, discretionary review was warranted. The commissioner's ruling addressed only the contempt determinations and coercive provisions of the appealed order and did not grant discretionary review of the orders pertaining to the form of the instruction, awarding attorney fees, or limiting summary judgment.

¶16 The Migrant Council's brief assigns error to the trial court's (1) order compelling it to respond to the citizenship and immigration status discovery, (2) sanctioning it for failure to provide responses as required by the order, (3) entering an overly-broad adverse inference instruction to be given at the time of trial, (4) imposing terms without notice and hearing, and (5) refusing to entertain a motion for summary judgment on the issue of overriding justification. We consider only the first two assignments of error, satisfied that review was not granted on the remaining three.[5]

## ANALYSIS

### I

¶17 We first address the Migrant Council's arguments that discovery into the board members' citizenship and immigration status was "no[t] relevant to its business" and that in denying its request for a protective order "the trial court failed to properly balance the low probative value of [the] discovery against the extreme danger of unfair prejudice." Br. of Appellant at 4. The scope of discovery

---

[5] If review had been granted on the issues identified by the Migrant Council's third through fifth assignments of error, we would decline to reach them as improvidently accepted for review. None meets the standard for discretionary review under RAP 2.3(b). For reasons we have recently reiterated, interlocutory review is disfavored. *See Minehart v. Morning Star Boys Ranch, Inc.*, 156 Wn. App. 457, 462, 232 P.3d 591, *review denied*, 169 Wn.2d 1029 (2010).

permitted against a corporation by the civil rules is not matters "relevant to its business," but matters "relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party." CR 26(b)(1). In seeking a protective order, the Migrant Council bore the burden of demonstrating good cause from which the court could determine that justice required an order of protection. CR 26(c). The trial court found that the citizenship and immigration status information sought by Mr. Diaz was critical information and its importance to his action was not outweighed by unwarranted prejudice to the Migrant Council's directors.

¶18 We review a trial court's discovery order for an abuse of discretion. *T.S. v. Boy Scouts of Am.*, 157 Wn.2d 416, 423, 138 P.3d 1053 (2006). Judicial discretion " 'means a sound judgment which is not exercised arbitrarily, but with regard to what is right and equitable under the circumstances and the law, and which is directed by the reasoning conscience of the judge to a just result.' " *Id.* (quoting *State ex rel. Clark v. Hogan*, 49 Wn.2d 457, 462, 303 P.2d 290 (1956)). An appellate court will find an abuse of discretion only on a " 'clear showing' " that the court's exercise of discretion was " 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.' " *Id.* (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

¶19 Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. ER 401. The Migrant Council has not shown that the trial court abused its discretion in concluding that evidence that a director was *not* legally in the United States would make it more probable that he or she would be motivated to discharge Mr. Diaz in retaliation than if he or she *were* legally in the United States.

¶20 In challenging the trial court's denial of its cross motion for a protective order, the Migrant Council argues that the court should have applied a balancing test, relying by analogy on *Snedigar v. Hoddersen*, 114 Wn.2d 153, 786 P.2d 781 (1990), which held that when a party shows that responding to discovery will infringe on its First Amendment rights, a court must balance that party's First Amendment privilege against the requesting party's claimed discovery need. This argument was not made below and we need not consider it. RAP 2.5(a). It is readily addressed, however, because it is well settled that a corporation does not have the Fifth Amendment privilege that the Migrant Council argues should have been balanced. *United States v. Kordel*, 397 U.S. 1, 7 & n.9, 90 S. Ct. 763, 25 L. Ed. 2d 1 (1970). Absent a constitutional interest of the Migrant Council implicated by the discovery, the rationale of *Snedigar* does not apply. Instead, the usual CR 26(c) standard (whether justice requires an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense) applied at the trial court. The usual abuse of discretion standard applies on review.

¶21 In arguing that the trial court abused its discretion, the Migrant Council urges us to consider *Rivera v. NIBCO, Inc.*, 364 F.3d 1057 (9th Cir. 2004), *cert. denied*, 544 U.S. 905 (2005), in which protection against immigration-status-related discovery was granted to workers asserting civil rights claims, and *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 230 P.3d 583 (2010), in which our Supreme Court recently addressed the prejudicial impact at trial of evidence of illegal immigration status. *Rivera* is readily distinguished. In affirming entry of a protective order, *Rivera* did not rely on the jeopardy to a party of revealing his or her illegal immigration status in and of itself; rather, the court found that such discovery in civil rights actions challenging abusive working conditions would chill important claims, burdening not only the plaintiffs but also the public interest. 364 F.3d at 1065. In finding the burden

"undue," it also relied on the fact that immigration status was relevant at most to damages, not liability, and that discovery, if ever needed, could be deferred to the damages portion of a bifurcated trial. *Id.* at 1069-70.

¶22 *Salas* substantially supports the trial court's protective order ruling. The case involved an injured construction worker's lawsuit against his employer, seeking damages that included lost earnings. After losing at trial, Mr. Salas challenged the trial court's admission of evidence that he was an illegal immigrant. He argued he was seriously prejudiced by the evidence and that the trial court abused its discretion under ER 403 in finding that the relevance of the evidence to his earnings claim outweighed the prejudice. The Supreme Court found that his illegal immigration status was relevant to his future earnings but only minimally so, because "[b]ased solely on his immigration status, the risk of Salas' being deported is exceptionally low." 168 Wn.2d at 669. It noted that less than one percent of the unauthorized immigration population was apprehended in 2008 (apart from immigrants apprehended at the border). The Supreme Court's conclusion that there was little chance of deportation from Mr. Salas's illegal status undercuts the Migrant Council's argument that even limited disclosure of its board members' status warranted completely foreclosing discovery in this case.

¶23 *Salas* holds that illegal immigration is a "politically sensitive issue" and "can inspire passionate responses" that interfere with a jury's deliberation, *id.* at 672; in light of the small likelihood that Mr. Salas would be deported, the Supreme Court agreed with Mr. Salas that the trial court abused its discretion in admitting the evidence at trial. But that was a trial call, made following discovery and with both sides armed with the information needed to effectively argue the relative weight of probative value and prejudice. There is nothing in *Salas* that supports cutting off inquiry at the outset of discovery. The Migrant Council has not shown an abuse of discretion by the trial court in denying a protective order.

II

¶24 The Migrant Council next argues that it should not have been found in contempt of the order compelling discovery because its directors lawfully invoked their Fifth Amendment rights and its complete compliance with the court's order was therefore "impossible." Br. of Appellant at 15, 18. CR 33 provides that where interrogatories are served on a corporate party, they are to be answered by any officer or agent, "who shall furnish such information as is available to the party." CR 34(a)(1) provides that a party may request discovery of documents which constitute or contain matters within the scope of CR 26(b) and "which are in the possession, custody or control of the party upon whom the request is served." Generally speaking, a party must make a "reasonable inquiry" to acquire the information or documentation sought by a discovery request. *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 343, 858 P.2d 1054 (1993).

¶25 The Migrant Council's duty to respond to discovery and the sanctions available where it fails to do so are the province of the civil rules. But terms used by CR 33 and 34—the duty to provide information "available" to a corporation and documents "in [a corporation's] possession, custody or control"—depend on the legal relationship between a corporation and its directors and the duties owed by directors.

¶26 A corporation is artificial, invisible, intangible, and existing only in contemplation of law. *Broyles v. Thurston County*, 147 Wn. App. 409, 428, 195 P.3d 985 (2008). The invisible, intangible object of our legal contemplation cannot answer discovery or be effectively sanctioned if it does not. By necessity it acts through its officers, directors, employees, and other agents. *See id.* As with a corporation's duties in every other sphere in which it operates, it is the

corporate officers, directors, and other agents who must discharge its duties in a lawsuit. Their failure to discharge the corporate duty is the corporation's failure to discharge its duty. *See id.*

¶27 The board of directors of a Washington nonprofit corporation is responsible for managing its affairs. RCW 24.03.095. Under 42 U.S.C. § 9837(c)(1)(A), the governing body of a Head Start agency—in this case, the Migrant Council's board—has legal and financial responsibility for the agency. Directors are required to perform their duties in good faith and with such care as an ordinarily prudent person in a like position would use under similar circumstances. *See* RCW 24.03.127. As a fiduciary, "a director's . . . first duty is to act in all things of trust wholly for the benefit of the corporation"; "[t]his encompasses a duty to disclose information to those who have a right to know the facts." 3 WILLIAM MEADE FLETCHER & CAROL A. JONES, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 837.50, at 190-91 (rev. vol. 2010).

¶28 The Migrant Council's argument that it should not have been found in contempt for its failure to permit inspection of its directors' personal citizenship and immigration documents is well taken. Its supplemental response to request for production 8 clarified that it did not have possession or custody of any responsive citizenship or immigration status documents, a representation never challenged by Mr. Diaz. At issue is only whether it had "control" over whatever responsive documents the directors had within their own possession. Appellate decisions in Washington are sparse, but federal case law is abundant. 3A KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE CR 34 author's cmt. 7, at 740 (5th ed. 2006). Our civil rules at issue are based on and substantially correspond to the federal rules of civil procedure, so we may look to federal cases interpreting federal discovery provisions for guid-

ance.[6] *Bryant v. Joseph Tree, Inc.*, 119 Wn.2d 210, 218-19, 829 P.2d 1099 (1992).

¶29 "Control," apart from possession, is defined as "the legal right to obtain the documents requested upon demand." *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984). Control may also be found where an entity has access to and the ability to obtain the documents. *Bank of N.Y. v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 144 (S.D.N.Y. 1997); *Addamax Corp. v. Open Software Found., Inc.*, 148 F.R.D. 462, 467 (D. Mass. 1993). The burden of demonstrating that the party from whom discovery is sought has the practical ability to obtain the documents at issue lies with the party seeking discovery. *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 n.7 (S.D.N.Y. 1992).

¶30 Mr. Diaz cites no statutory or common law authority, nor have we identified any, imposing a duty on a corporate director to make personal records available to the corporation that he or she serves. Cases holding that a custodian of corporate records cannot invoke the Fifth Amendment in response to a subpoena directed to the corporation suggest that no such duty exists, inasmuch as they rely on a rationale that a subpoena to the corporation does not subject a custodian's personal papers to inspection. *See, e.g., Wilson v. United States*, 221 U.S. 361, 386, 31 S. Ct. 538, 55 L. Ed. 771 (1911) ("None of his personal papers are subject to inspection under the writ."). Mr. Diaz has not shown that the Migrant Council had the legal or practical ability to secure any responsive personal records belonging to the directors. Following the Migrant Council's supplemental response to discovery, the court had no basis for finding it in contempt for a failure to respond to request for production 8.

---

[6] CR 33 and Fed. R. Civ. P. 33(b)(1)(B) each require that the information sought by interrogatories be "available" to the responding party. CR 34 and Fed. R. Civ. P. 34(a)(1) each require that documents sought by a request for production be in the "possession, custody or control" of the responding party.

¶31 The Migrant Council's failure to respond to interrogatory 20 is another matter. No Washington case has addressed the issue raised by the Migrant Council: whether information known by a corporation's directors apart from their service to the corporation, but relevant to their conduct for which the corporation is being sued, is "available" to the corporation for purposes of discovery. Here again, federal cases are instructive.

¶32 The Fifth Amendment is no impediment to the corporation's asking a director for information needed for discovery and relying on him or her to respond. *See, e.g., United States v. Solomon*, 509 F.2d 863 (2d Cir. 1975) (officer and director's inculpatory statements provided in an internal investigation were not privileged under the Fifth Amendment; no state compulsion was involved); *United States v. Shvarts*, 90 F. Supp. 2d 219, 222 (E.D.N.Y. 2000) (questions put to defendant in carrying out a private corporation's own legitimate investigatory purposes do not activate the privilege against self-incrimination), *abrogated on other grounds by United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001); *D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 279 F.3d 155, 162 (2d Cir.) (while internal investigation may entail exposure to criminal liability, that in itself is not enough to establish a governmental nexus implicating the Fifth Amendment), *cert. denied*, 537 U.S. 1028 (2002). The fact that a corporation's agent has invoked the Fifth Amendment in response to individual questioning does not excuse the corporation from its duty to respond to discovery. *See In re Folding Carton Antitrust Litig.*, 76 F.R.D. 417, 419-20 (N.D. Ill. 1977). Moreover, a corporation's failure to respond to discovery because its officers and directors in possession of relevant information have invoked their Fifth Amendment privilege may be considered willful and deliberate since it results from a deliberate choice on the part of the officers and/or directors. *Id.; see also Worthington Pump Corp. (U.S.A.) v. Hoffert Marine, Inc.*, 34 Fed. R. Serv. 2d (West) 855, 1982 WL 308871, at *3, 1982 U.S. Dist. LEXIS 17968, at *6-7 (D.N.J.).

¶33 A director may be reluctant to provide the information to the corporation out of the same self-interest that prompts him or her to invoke the Fifth Amendment when deposed. But the Fifth Amendment protects only against state-compelled self-incrimination, it "does not protect against hard choices." *Solomon*, 509 F.2d at 872.

¶34 Where an interrogatory is directed at a corporation, "the phrase 'such information as is available to the party' has been construed to mean all information available to the corporation's officers, directors, employees and attorneys." *Chapman & Cole v. Itel Container Int'l B.V.*, 116 F.R.D. 550, 558 (S.D. Tex. 1987); *Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1210 (8th Cir. 1973), *cert. denied*, 414 U.S. 1162 (1974). Knowledge of officers and employees of a corporation relative to the subject matter of litigation is imputed to the corporation. *Gen. Dynamics*, 481 F.2d at 1210 (citing *Acme Precision Prods., Inc. v. Am. Alloys Corp.*, 422 F.2d 1395, 1398 (8th Cir. 1970)). A corporation's failure to obtain and provide all such information is incomplete and therefore must be treated as a failure to respond. *Chapman & Cole*, 116 F.R.D. at 558 (citing *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 616 (5th Cir. 1977), *cert. denied*, 435 U.S. 996 (1978)).

¶35 The Migrant Council's core argument is that the trial court abused its discretion and violated the Migrant Council's due process rights "when it ordered the Council to do the impossible: to produce documents and information about the actual immigration status of its current or former volunteer Board members." Br. of Appellant at 15. The directors presumably have responsive information. But the Migrant Council inexplicably excludes its directors from "the Council" whose duty it is to respond. When asked at oral argument which human actors the Migrant Council has in mind as "the Council" that cannot respond, its lawyers identified themselves and the several corporate contacts who assisted them in drafting responses. Whether a corporation has reasonably responded to discovery is not

measured solely by whether the lawyers and corporate administrators tasked with drafting responses have included all of the information they have collected. It is substantially measured by whether corporate directors, officers, employees, and other agents who possess responsive information have provided it to be included in the corporation's response.

¶36 The fact that a corporation's lawyers and their contacts have been unable to secure cooperation may be an explanation for a corporation's insufficient response, but it does not excuse it. This is so even where cooperation is lacking because corporate principals are concerned about criminal culpability. If corporate principals' refusal to cooperate out of concern for self-incrimination excused a corporation from providing relevant information in discovery, then there would be an inverse relation between corporate management's violation of law and an adverse party's ability to prove it: the more criminally culpable a corporation's management, the less its obligation to provide discovery. We may assume that in many cases where corporate principals refuse to cooperate in responding to discovery it is for substantial self-serving reasons. The fact remains that the corporation—whose employees, officers, and directors *could* provide the needed information—has not provided it.

¶37 The Migrant Council nonetheless argues that even if a director is obliged to provide information needed by the corporation to respond to discovery about "corporation matters," the director's obligation "does not extend to personal information . . . acquired outside the scope of her official duties." Br. of Appellant at 19. It relies on the majority opinion in *Gerling International Insurance Co. v. Commissioner*, 839 F.2d 131 (3d Cir. 1988) but mischaracterizes the *Gerling* majority's holding. While the majority opinion discusses some cases that draw a distinction between information learned by an officer through his or her work for the corporation and knowledge gained otherwise, it also

cites cases holding that knowledge of officers and key employees of a corporation, "if relevant to the subject matter of an interrogatory or production request directed to the corporation, may be imputed to the corporation itself." 839 F.2d at 138. Ultimately, the majority states:

> We are mindful of the depth and breadth of the fiduciary duty owed by an officer of a Delaware corporation to his or her corporation. It well may be that, in the absence of a counter-vailing duty to another, such an officer has a duty to provide the corporation with any information in his or her possession having relevance.

*Id.* at 139. The majority assumes this to be the case. *Id.* As a result, its decision does not rest on bifurcating the sources of an officer's knowledge but on its conclusion that the information being requested from the corporation was not relevant. Here, the trial court determined that the information requested was relevant, a conclusion with which we agree.

¶38 We do not find the cases cited by *Gerling* in support of bifurcating a corporate principal's knowledge to be persuasive. Moreover, they conflict with analogous agency principles recognized by Washington courts.[7] See *American Fidelity & Casualty Co. v. Backstrom*, 47 Wn.2d 77, 82, 287 P.2d 124 (1955), which stated that the law imputes to a principal all of an agent's knowledge relating to the subject matter of the agency " 'which he may previously have acquired, and which he then had in mind, or which he had acquired so recently as to reasonably warrant the assump-

---

[7] Whether and to what extent a director is fairly characterized as a corporation's agent is a matter of debate. *Compare* 3 FLETCHER & JONES, *supra*, § 838, at 217 ("courts of law generally treat directors as agents"), *and Blaustein v. Pan Am. Petroleum & Transp. Co.*, 263 A.D. 97, 123, 31 N.Y.S.2d 934 (1941) (same) (quoting *Bosworth v. Allen*, 168 N.Y. 157, 61 N.E. 163, 165 (1901)), *aff'd*, 293 N.Y. 281, 56 N.E.2d 705 (1944), *with Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 539-40 (Del. 1996) (directors of Delaware corporations are not agents in the ordinary course of their service as directors; the board controls the corporation, not vice versa), *and* RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. f(2) (2006) (directors are not "common-law" or "true" agents of a corporation, as defined by the *Restatement*).

tion that he still retained it' " (internal quotation marks omitted) (quoting *Miller v. United Pac. Cas. Ins. Co.*, 187 Wash. 629, 638, 60 P.2d 714 (1936)); *Busk v. Hoard*, 65 Wn.2d 126, 135, 396 P.2d 171 (1964), which stated that in most instances, the time, place, or manner in which the agent obtains knowledge is immaterial in charging it to the principal (citing RESTATEMENT (SECOND) OF AGENCY § 276 (1958)); and see RESTATEMENT (THIRD) OF AGENCY § 5.03 cmt. e (2006), carrying forward § 276 of the second *Restatement*,[8] which states in part:

> When an agent is aware of a fact at the time of taking authorized action on behalf of a principal and the fact is material to the agent's duties to the principal, notice of the fact is imputed to the principal although the agent learned the fact prior to the agent's relationship with the principal, whether through formal education, prior work, or otherwise. Likewise, notice is imputed to the principal of material facts that an agent learns casually or through experiences in the agent's life separate from work.
>
> . . . .
>
> . . . When an agent is an individual, the breadth of imputation . . . reflects the fact that an individual agent's mind "cannot be divided into compartments . . . ." Restatement Second, Agency § 276, Comment *a*.

The imputation of knowledge follows from the duty of an agent to communicate his knowledge to the principal. *Deep Water Brewing, LLC v. Fairway Res. Ltd.*, 152 Wn. App. 229, 268, 215 P.3d 990 (2009), *review denied*, 168 Wn.2d 1024 (2010).

¶39 Where the law pertaining to a director's fiduciary duty to the corporation regards all of his or her knowledge relevant to conduct for which the corporation is being sued as "available" to the corporation, there is certainly no reason to treat it otherwise for purposes of discovery. If relevant, it is discoverable. Nothing is gained by permitting

---

[8] 2 RESTATEMENT (THIRD) OF AGENCY 489 (2006) (parallel tables).

discovery into a director's "professional sphere" knowledge to be directed to the Migrant Council while requiring discovery into his or her "personal sphere" knowledge to be directed to the director individually, using nonparty discovery procedures. Any such construction of the rules would create an unequal playing field. Individual parties like Mr. Diaz cannot claim a "personal sphere" of relevant information as to which the Migrant Council is relegated to nonparty discovery procedures. While a trial court may require a party to limit or redirect its discovery into facts known to a corporation's directors or officers based on the same considerations of fairness and efficiency that may be raised by any party,[9] a corporation may not refuse to respond entirely, as the Migrant Council did here, on the basis that relevant facts known to its directors are known to them "personally."

## III

¶40 Finally, the Migrant Council cites *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707, 102 S. Ct. 2099, 72 L. Ed. 2d 492 (1982) for the proposition that the requirement of Federal Rule of Civil Procedure 37(b)(2) that an order imposing sanctions be "just" represents a due process restriction on a court's discretion. It argues that the trial court violated its right to due process under CR 37's parallel requirement of a "just" order by imposing a sanction. Br. of Appellant at 4, 33.

¶41 A threshold problem with the Migrant Council's argument is that the only sanction ultimately imposed by the trial court (arguably not a sanction at all) was entry of

---

[9] For instance, and particularly where corporate principals are themselves named as parties, a trial court may determine that one source of response is sufficient or superior. *See* CR 26(b)(1)(A), (B); CR 26(c). We also recognize that some courts have acted to protect persons in upper levels of management from discovery where there is no warrant for requiring the participation of such individuals. *See* 9A WILLIAM MEADE FLETCHER & CAROL A. JONES, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 4663 (rev. vol. 2008) (discussing the "apex doctrine" applied in some jurisdictions).

its order in the nature of an order in limine that some adverse inference instruction would be warranted at trial—the "lesser sanction" eventually proposed by the Migrant Council itself. It was the Migrant Council that urged the trial court that an adverse inference instruction may be "an appropriate CR 37 sanction" and would "not only . . . respect the important constitutional rights at issue—it also is more than sufficient to protect plaintiffs' interests." CP at 1087-88. It did not argue below that its proposed lesser sanction was unjust and would violate its due process rights. We do not generally entertain arguments for the first time on appeal, RAP 2.5(a), and do not review invited error. *City of Seattle v. Patu*, 147 Wn.2d 717, 720, 58 P.3d 273 (2002) (invited error doctrine prohibits a party from setting up an error at trial and complaining of it on appeal, even where alleged to be of constitutional magnitude). We will address the issue here, however, because an adverse inference instruction does not implicate the due process concerns discussed in *Insurance Corp. of Ireland* and warrants acknowledgement as a reasonable response to the discovery problem in this case.

¶42 The Supreme Court relied in *Insurance Corporation of Ireland* on its earlier decision in *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 29 S. Ct. 370, 53 L. Ed. 530 (1909). *See, e.g.*, 456 U.S. at 709. *Hammond Packing* distinguished between "a denial of all right to defend as a mere punishment" and "the undoubted right of the lawmaking power to create a presumption." 212 U.S. at 350-51. The Court concluded in *Hammond* that when a court applies a presumption in response to a refusal to produce material evidence, it does not deny due process; to the contrary, through applying the presumption, "the preservation of due process [is] secured." *Id.* at 351.

¶43 It is well settled that in civil litigation the exercise by a party of his or her Fifth Amendment privilege does not protect the invoking party from adverse inferences that may logically be drawn from its exercise. *Baxter v.*

*Palmigiano*, 425 U.S. 308, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976); *King v. Olympic Pipe Line Co.*, 104 Wn. App. 338, 355-56, 16 P.3d 45 (2000) (citing *Ikeda v. Curtis*, 43 Wn.2d 449, 458, 261 P.2d 684 (1953)), *review denied*, 143 Wn.2d 1012 (2001). In a civil proceeding such an inference is permissible, where appropriate, not as a sanction or remedy for any unfairness created by exercise of the privilege but simply because the inference is relevant and outside the scope of the privilege. *Steiner v. Minn. Life Ins. Co.*, 85 P.3d 135, 143 (Colo. 2004) (Coats, J., concurring). Fifth Amendment invocations by corporate employees or principals may also result in an adverse inference drawn against the corporation. *See Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.*, 819 F.2d 1471, 1481 (8th Cir. 1987) (former employee invoking privilege); *Rad Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271 (3d Cir. 1986) (past or present corporate employees); *Rosebud Sioux Tribe v. A&P Steel, Inc.*, 733 F.2d 509, 523 (8th Cir.) (inference from tribal chair's invoking privilege), *cert. denied*, 469 U.S. 1072 (1984); *Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983) (probative value of assertion of Fifth Amendment by former employees outweighed prejudice); *City of Chi. v. Reliable Truck Parts Co.*, 768 F. Supp. 642 (N.D. Ill. 1991) (corporate agent invoking privilege); *see also LiButti v. United States*, 107 F.3d 110, 122 (2d Cir. 1997) (invocation of Fifth Amendment by nonparty witness supports inference if there is a relationship of loyalty with a party); *Fed. Deposit Ins. Corp. v. Fid. & Deposit Co. of Md.*, 45 F.3d 969, 978 (5th Cir. 1995) (adverse inference can be drawn from any relevant invocation of the Fifth Amendment by a nonparty witness).

¶44 Of course a request that the court give an adverse inference instruction in a civil case may be made anytime a witness with the necessary relation to a party invokes the Fifth Amendment; it need not be raised by a motion to compel discovery and is not, fundamentally, a sanction. Nonetheless, a party finding itself in the position in which

Mr. Diaz found himself in this case has a legitimate interest in determining well before trial whether his adversary will persist in refusing to permit discovery and, if so, what his remedy will be. Using a motion to compel (and, if necessary, a motion seeking a sanction for a failure to comply) is a reasonable procedure for getting the issue before the court. An order that the court will give an adverse inference instruction at the time of trial can be a reasonable and just order in regard to a failure to permit discovery under CR 37(b)(2)(A), recognizing that in punishing a discovery violation, "the court should impose the least severe sanction that will be adequate to serve the purpose of the particular sanction." *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 495-96, 933 P.2d 1036 (1997).

¶45 In light of the parties' settlement and posthearing motion to this court, we remand this matter to the trial court for entry of the dismissal order requested by the parties.

KULIK, C.J., and KORSMO, J., concur.